UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**NOT FOR PUBLICATION**

THE ESTATE OF SHELDON A. SAMUEL, by the administratrix of his estate, DIAMOND MORRIS,

Plaintiff,

– against –

JONATHAN CALDERON, ASHLEY GONZALEZ, DANIEL MOLINSKI, DEAN ROBERTS, and VANCE MERRICK,

Defendants.

**MEMORANDUM & ORDER**

17-CV-5518 (ERK) (TAM)

KORMAN, *J.*:

On the night of February 21, 2016, 47-year-old Sheldon Samuel suffered a stroke while driving his van in Brooklyn. As a result, Samuel collided into the back of an unmarked police van, leading to his arrest, during which he was punched twice in the face by a police officer. Samuel was promptly brought to the hospital and died from complications of stroke on March 6, 2016. Samuel's estate ("plaintiff"), represented in this action by its administratrix Diamond Morris, filed the instant lawsuit against five New York City Police Department ("NYPD") officers involved in Samuel's arrest and hospitalization. Those defendants are Officer Jonathan Calderon, Officer Ashley Gonzalez, Sergeant Daniel Molinski, now-retired Officer Dean Roberts, and Lieutenant Vance Merrick. Plaintiff brings claims against each

of the named defendants under 42 U.S.C. § 1983 for false arrest, excessive force, and denial of medical care. *See* ECF No. 99. Each claim is brought against each defendant for direct participation in the constitutional violation or, in the alternative, for failure to intervene to prevent it. *See* ECF No. 99 ¶¶ 34–35, 41, 51. Defendants have moved for summary judgment on all claims brought against them pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See* ECF No. 142.

## BACKGROUND

The following facts are taken from the parties' Local Civil Rule 56.1 statements, their summary judgment briefs, and the evidence submitted by the parties. They are undisputed unless otherwise indicated.

At approximately 11:05 PM on February 21, 2016, near the intersection of Glenmore and Sheffield Avenues in Brooklyn, Officers Jonathan Calderon and Ashley Gonzalez initiated a car stop. ECF No. 146 ¶ 15.[1] To do so, the officers double-parked their unmarked police van alongside the vehicle. *Id.* ¶¶ 17–18; ECF No. 148 ¶¶ 207, 208. Officers Calderon and Gonzalez then exited their van and approached the vehicle. ECF No. 146 ¶ 19. Nearby and around that same time, Sheldon Samuel was driving a van when he suffered a stroke. *Id.* ¶¶ 1, 3; ECF No. 148 ¶ 202. While Calderon and Gonzalez were standing on either side of the vehicle

[1] For ease of reference, citations are to the statements and counterstatements of material fact rather than the underlying evidence in the record from which the statements and counterstatements are derived.

they had stopped, Mr. Samuel's van turned right from Glenmore Avenue onto Sheffield Avenue and collided with the rear of the unmarked police van. ECF No. 146 ¶ 20; ECF No. 148 ¶¶ 210–11. The parties dispute whether the collision was violent enough to qualify as a crash, *see* ECF No. 146 ¶ 20, but it is undisputed that the airbags in Samuel's vehicle did not deploy, *see* ECF No. 148 ¶ 213. Video footage of the collision reveals that it occurred at relatively low speed, but fast enough for Samuel's vehicle to visibly jerk backwards upon impact. *See* ECF No. 144, Ex. 11. A large indent was photographed on the front bumper of Samuel's vehicle after the incident, though nothing definitively proves it was caused by the collision. *See* ECF No. 144-18.

The parties sharply dispute whether—following the collision—Calderon and Gonzalez ordered Samuel to exit the vehicle, the degree to which Samuel appeared to be moving his head and hands, and whether Samuel repeatedly stepped on the gas pedal following the crash. *See* ECF No. 146 ¶¶ 22–25. Nevertheless, it is undisputed that "[i]mmediately after the collision[,] Mr. Samuel sat in his vehicle turning his [h]ead left to right." *Id.* ¶ 224. Though they disagree on how calmly this was done, the parties agree that either Calderon or Gonzalez called other officers to the scene via radio. *Id.* ¶ 27 (plaintiff asserting that "Calderon or Gonzalez, or both, were 'screaming over the radio' and 'urg[ing] everyone to come over.'"). When other officers arrived at the scene, Samuel was "completely non-verbal," and "was observed swaying back and forth and sweating profusely." *Id.* ¶ 225.

Defendant Sergeant Molinski responded to the scene, where he observed officers surrounding Samuel's van with their guns drawn ordering him to exit the vehicle. *Id.* ¶¶ 29–31, 33. Molinski and two other non-party officers rushed to Samuel's van, and Molinski stood by the driver-side door. *Id.* ¶¶ 34–35. Samuel continued to be non-verbal and made no movements indicating he was trying to unlock the door to his van. *Id.* ¶¶ 43–44; ECF No. 148 ¶ 228. The parties dispute whether Samuel's eyes were bloodshot and whether he was stepping on the gas pedal at this point. ECF No. 146 ¶¶ 36, 39–41. A non-party officer broke one of the van's windows and unlocked it, after which Molinski and at least one other officer pulled Samuel out of the van. *Id.* ¶¶ 46–47, 52, 56. It is disputed whether Molinski gave Samuel an opportunity to step out of the van of his own accord, whether Samuel once again stepped on the gas pedal this point, and whether Samuel resisted being pulled out of the van. *Id.* ¶¶ 48–49, 52–55. Once Samuel was out of his vehicle, Sergeant Molinski struck him twice in the face. *Id.* ¶ 61. Samuel was then placed face-first on the ground and handcuffed. *Id.* ¶¶ 62–63.

Back at the police precinct, defendant Lieutenant Vance Merrick learned that Calderon or Gonzalez had radioed-in for backup and he responded to the scene. *Id.* ¶¶ 68–69. Merrick arrived at the scene after Samuel had already been placed in handcuffs. *Id.* ¶ 86. Merrick spoke with Officers Calderon and Gonzalez, who informed him that Samuel had rear-ended their police van while it was double-parked. *Id.* ¶¶ 72–73. Merrick was then told by unidentified officers that Samuel

was bleeding from his nose and mouth. *Id.* ¶ 76. Merrick asked if an ambulance had been called and, after being told that it had, again requested an ambulance. *Id.* ¶¶ 77–78. Though Merrick observed that Samuel was bleeding from his nose and mouth, he did not speak with Samuel. *Id.* ¶¶ 79–80. Merrick testified at his deposition that someone at the scene—he could not recall whom—told him that Samuel was under arrest because "he was under the influence." ECF No. 142-9 at 87:19–88:9. Merrick also testified that he recalled someone at the scene saying that Samuel had a "strong scent of alcohol on [] his breath or coming from him." *Id.* Because an ambulance had not yet arrived, Merrick ordered non-party Officers Hedrick Mitial and Marvin Collings to transport Samuel to Brookdale Hospital by marked police car. ECF No. 146 ¶¶ 91–94, 96. Samuel was transported directly to Brookdale Hospital, arriving there approximately thirty-one minutes after his collision with the police van. *Id.* ¶¶ 103, 135–36. It is undisputed that Mitial "did not waste any time transporting Mr. Samuel to Brookdale Hospital." *Id.* ¶ 109.

Upon his arrival at Brookdale Hospital, Samuel was placed on a stretcher and taken directly to the Emergency Room. *Id.* ¶¶ 111–13. Though the parties dispute how long Mitial and Collings stayed, both officers remained at Brookdale for at least ten minutes and possibly over an hour after they brought Samuel in. *Id.* ¶¶ 115–16; ECF No. 148 ¶¶ 252–53.

Defendant Officer Dean Roberts was assigned the arrest by Lieutenant Merrick, though Roberts was not present at the scene when the arrest took place.

ECF No. 146 ¶¶ 122–24. Before going to Brookdale Hospital, Roberts first went to the scene of the collision, from which Samuel had already been removed. *Id.* ¶¶ 125–26. After he arrived, Roberts tried to speak with Samuel, but Samuel was unresponsive. *Id.* ¶¶ 127–28. All parties agree that Roberts was unaware that Samuel had suffered a stroke. *Id.* ¶ 132. Roberts then charged Samuel with reckless endangerment, operating a motor vehicle under the influence of alcohol or drugs, reckless driving, resisting arrest, and refusal to take a breathalyzer test. *Id.* ¶ 133. In his arrest report, Roberts noted that Officer Molinski had told him that Samuel had the "smell of alcohol on his breath." *See* ECF No. 144-10 at 1.

Samuel was examined by Brookdale Hospital staff upon his arrival. ECF No. 146 ¶ 137. It is undisputed that police personnel told hospital staff that Samuel was intoxicated. ECF No. 148 ¶ 247. Approximately three hours after Samuel was brought to the hospital, at 2:35 AM, his blood was drawn and tested for the presence of alcohol. ECF No. 146 ¶¶ 158–60. The results of Samuel's blood test were available at 4:18 AM and returned negative for alcohol being in his system. *Id.* ¶¶ 165–66. Samuel was not diagnosed with or treated for stroke until, at the earliest, over four hours after he had been brought to the hospital. *Id.* ¶¶ 134, 165; ECF No. 144-2 at 29:6–11. The first notation in Samuel's medical record that he had suffered a stroke was entered on February 24, 2016, approximately two days after Samuel was brought to the hospital. ECF No. 146 ¶ 145. All parties agree that had Samuel been diagnosed with stroke within four hours of his arrival, hospital staff could have

evaluated whether he was a good candidate for "clot buster" medication which renders stroke symptoms much less severe. *Id.* ¶¶ 184–86; ECF No. 148 ¶ 272.

Samuel passed away on March 6, 2016, from complications of stroke, a cause of death deemed "natural." ECF No. 146 ¶¶ 197–200. An autopsy performed on Samuel revealed he had also suffered "blunt impact injur[ies] of upper extremities with abrasions and contusions, subcutaneous hemorrhage" and "blunt impact injuries of lower extremities with abrasions and contusion, subcutaneous hemorrhage." ECF No. 148 ¶ 237. In layman's terms, this means that Samuel had scraped skin and deep bruising on his arms and legs. *See* Stedman's Medical Dictionary 1740, 201610, 1000680 (Nov. 2014); ECF No. 144-24, at 4–5.

## LEGAL STANDARDS

### 1. Rule 56 Motions

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be granted where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(a). A material fact is one that would "affect the outcome of the suit under the governing law." *Andersen v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Courts ruling upon summary judgment motions must assess the record in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *See Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 177 (2d Cir. 1990). Applying this standard, summary judgment should be granted

"against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

**2. 42 U.S.C. § 1983 Motions**

Section 1983 imposes civil liability upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws of the United States. *See* 42 U.S.C. § 1983; *Kraft v. City of New York*, 696 F. Supp. 2d 403, 412 (S.D.N.Y. 2010). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). A Section 1983 plaintiff must show that each defendant was personally involved in the alleged deprivation. *See Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001). Additionally, plaintiffs bear the burden of showing, for each individual defendant, that the defendant's conduct was the proximate cause of the deprivation of the right. *Conklin v. Cnty. of Suffolk*, 859 F. Supp. 2d 415, 438 (E.D.N.Y. 2012).

False arrest, excessive force, and denial of medical care are all forms of constitutional violations upon which a Section 1983 claim may be premised. *See,*

*e.g.*, *Caroll v. United* States, 267 U.S. 132, 155–56 (1925); *Graham v. Connor,* 490 U.S. 386, 393–94 (1989); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243–44 (1983).

**3. Qualified Immunity**

All five individual defendants raise the affirmative defense of qualified immunity for each claim asserted against them. *See* ECF No. 100 ¶ 58. Qualified immunity shields officials from lawsuits for violating plaintiffs' rights so long as the official did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Conversely, qualified immunity does not protect officer conduct where "it would be clear *to a reasonable officer* that his [or her] conduct was unlawful in the situation he [or she] confronted." *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007) (emphasis in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Said differently, qualified immunity shields officials from liability for "bad guesses in gray areas" but not for "transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

A right is clearly established if: "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003)

(alterations in original) (quoting *Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998)). Because the qualified immunity standard is defined in objective terms, a defendant's subjective motivations are generally irrelevant. *Duamutef v. Hollins*, 297 F.3d 108, 113 (2d Cir. 2002). Qualified immunity is determined on an individual-by-individual and claim-by-claim basis. *Cipley v. Cnty. of Nassau*, 20-cv-975 (JMA) (ST), 2025 WL 1319006, at *6 n. 4 (E.D.N.Y. May 7, 2025); *Siddique v. City of New York*, No. 22-CV-03807 (HG), 2025 WL 964009, at *4 (E.D.N.Y. Mar. 31, 2025). Pursuant to the party presentation principle, if defendants do not raise the issue of qualified immunity with sufficient particularity, a court may not deny a claim on this basis. *See Clark v. Sweeney*, 607 U.S. 7, 9–10 (2025); *Siddique*, 2025 WL 964009, at *4.

**4. Failure to Intervene**

Police officers have an "affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in [their] presence by other officers." *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988). To establish that an officer is liable for failure to intervene, plaintiff must show that (1) the officer observes or has reason to know that other officers have committed a constitutional violation, (2) the officer had a realistic opportunity to intervene to prevent the harm from occurring, and (3) the officer did not take reasonable steps to intervene. *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *Cornell v. Vill. of Clayton*, 691 F. Supp. 3d 608, 620 (N.D.N.Y. 2023).

Though a defendant cannot be simultaneously liable for violating a plaintiff's constitutional rights and for failing to intervene to prevent the violation, both claims may survive summary judgment as alternative theories of liability. *See Buchy v. City of White Plains*, No. 14 CV 1806 (VB), 2015 WL 8207492, at *3 (S.D.N.Y. Dec. 7, 2015); *Davis v. City of New York*, No. 13 CV 6260 (RML), 2021 WL 3492307, at *13 (E.D.N.Y. Aug. 9, 2021); *Polanco v. City of New York*, No. 14 Civ. 7986 (NRB), 2018 WL 1804702, at *9–10 (S.D.N.Y. Mar. 28, 2018). Some courts have held that because a defendant can ultimately only be liable for either direct participation or failure to intervene, only one of these theories can survive summary judgment. *See, e.g.*, *Cuellar v. Love*, No. 11-cv-3632 (NSR), 2014 WL 1486458, at *8 (S.D.N.Y. Apr. 11, 2014). However, "[t]he majority of cases addressing this issue permitted alternative direct participation and failure to intervene claims to proceed beyond the summary judgment stage." *Davis*, 2021 WL 3492307, at *13. This holding is consistent with Fed. R. Civ. P. 8, which permits plaintiffs to "plead two or more statements of a claim, even within the same count, regardless of consistency." *Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 95 (2d Cir. 1994); *see also Adler v. Pataki*, 185 F.3d 35, 41 (2d Cir. 1999); *Polanco*, 2018 WL 1804702, at *10; *Omega Exec. Servs. v. Grant*, No. 78 Civ. 4616, 1980 WL 1432, at *2 (S.D.N.Y. Aug. 22, 1980). Likewise, the Second Circuit has held that parties may submit alternative theories on the same count to a jury, even where those theories are legally or factually inconsistent. *See Riverwoods Chappaqua Corp. v. Marine Midland Bank*, *N.A.*, 30

F.3d 339, 343 (2d Cir. 1994); *Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 95 (2d Cir. 1994). Additionally, a rule prohibiting both theories from surviving summary judgment would require courts to determine which theory is more viable, an inquiry inappropriate at the summary judgment stage.

All three of the counts plaintiff asserts in this action—false arrest, excessive force, and denial of medical care—are constitutional violations for which a non-intervening officer may be liable. *See Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (recognizing that an officer may be liable for failure to intervene in a fellow officer's excessive use of force); *Folk v. City of New York*, 243 F. Supp. 3d 363, 375–76 (E.D.N.Y. 2017) (recognizing that an officer may be liable for failure to intervene to prevent false arrest); *Milo v. City of New York,* 59 F. Supp. 3d 513, 525 (E.D.N.Y. 2014) (recognizing liability for failure to intervene in the denial of medical care context).

## DISCUSSION

### 1. Individual Versus Official Capacity

Plaintiff's third amended complaint does not specify whether the five NYPD defendants are being sued in their official or individual capacity. When pleadings are vague on this point, courts in the Second Circuit look to the "course of proceedings" to determine "the nature of the liability sought to be imposed." *Rodriguez v. Phillips*, 66 F.3d 470, 482 (2d Cir. 1995). The default assumption is that a state official is named in his or her individual capacity. *See Santucci v. Levine*,

No. 17-CV-10204 (PMH), 2021 WL 76337, at *9 (S.D.N.Y. Jan. 8, 2021); *Kravtsov v. Town of Greenburgh*, No. 10-CV-3142 (CS), 2012 WL 2719663, at *24 (S.D.N.Y. July 9, 2012).

Applying the "course of proceedings" test, it is clear plaintiff has sued the five NYPD defendants in their individual capacities only. This is readily apparent from plaintiff's pursuit of punitive damages, *see* ECF No. 99 at 9, a remedy only available under § 1983 against individuals sued in their individual capacity, *see De Michele v. City of New York*, No. 09 Civ. 9334 (PGG), 2012 WL 4354763, at *23 (S.D.N.Y. Sept. 24, 2012). Likewise, both parties argue about qualified immunity without discussing its unavailability to officials sued in their official capacity. *See Almonte v. City of Long Beach*, 478 F.3d 100, 106 (2d Cir. 2007) ("Immunity, either absolute or qualified, is a *personal* defense that is available only when officials are sued in their individual capacities. . . ."). This further indicates that defendants are being sued in their individual capacities.

**2. False Arrest**

Plaintiff first asserts a Section 1983 claim for false arrest in violation of Samuel's Fourth Amendment right to be free from unreasonable seizures, ECF No. 99 ¶ 35, which includes the right to "remain free from arrest absent probable cause," *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006).

**a. Legal Standard**

Courts in the Second Circuit "generally "look[] to the law of the state in which the arrest occurred" for Section 1983 false arrest claims. *Davis v. Rodriguez*, 364 F.3d 424, 433 & n.7 (2d Cir. 2004). Under New York law, a claim for false arrest requires the following four elements: (1) the defendant intentionally confined plaintiff, (2) plaintiff was conscious of the confinement, (3) plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. *See Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003); *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975). Defendants argue that the fourth element is not met here because there was probable cause to arrest Samuel. ECF No. 142-1, at 9–16. The existence of probable cause constitutes a complete defense to a false arrest claim because it renders confinement privileged. *Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir.1999); *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *Jocks*, 316 F.3d at 135. An officer has probable cause to arrest when they possess "reasonably trustworthy information as to facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Swanhart v. Jackson*, No. 7:20 CV 6819 (NSR), 2026 WL 192395, at *4 (S.D.N.Y. Jan. 23, 2026) (quoting *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012)). "[P]robable cause can exist even where it is based on mistaken information, so long as the arresting officer acted

reasonably and in good faith in relying on that information." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994).

**b. Analysis**

Based on the undisputed facts, there was probable cause to arrest Samuel for either reckless driving or driving under the influence of alcohol because it was not unreasonable for officers to overlook Samuel's symptoms of stroke. The parties' briefs focus on whether there was probable cause to arrest Samuel for driving under the influence, but probable cause to arrest for *any* offense is sufficient to defend against a claim of false arrest. *See Ackerson*, 702 F.3d at 20.

Viewing the record in the light most favorable to plaintiff, no jury could conclude that it was unreasonable for officers to believe that Samuel was driving recklessly or under the influence of alcohol. It is undisputed that the arrest took place late at night; that Samuel struck a parked police van; that he was non-verbal, sweating profusely, and swaying back and forth; and that he had to be removed from his vehicle. ECF No. 146 ¶¶ 46–47, 56; ECF No. 148 ¶¶ 210–11, 225, 228. These facts are consistent with the conclusion that Samuel was driving under the influence of alcohol. Thus, any reasonable jury would find that the arresting officers had probable cause to believe that Samuel was driving recklessly or under the influence when they first apprehended him. *See Hoyos v. City of New York*, 999 F. Supp. 2d 375, 387–88 (E.D.N.Y. 2013) (officers had probable cause to arrest plaintiff where he was observed driving erratically in the early hours of the morning, almost striking

a police van at slow speed, and was in a "groggy" state, even if he did not smell of alcohol and was not drunk). Once they had probable cause, officers on the scene did not have a duty to further investigate whether Samuel was having a medical crisis before arresting him. *See Oquendo v. City of N.Y.*, 774 F. App'x 703, 705 (2d Cir. 2019); *Krause v. Bennett*, 887 F.2d 362, 371–72 (2d Cir. 1989); *Brandon v. City of New York*, 20 Civ. 7784 (LAK) (SLC), 2023 U.S. Dist. WL 4828170, at *6 (S.D.N.Y. June 6, 2023) ("[A]n officer in possession of credible information sufficient to effect an arrest is under no obligation to conduct further investigation." (quoting *Guerrero v. City of New York*, No. 12 Civ. 2916 (RWS), 2013 WL 5913372, at *4 (S.D.N.Y. Nov. 4, 2013)).

Furthermore, none of the medical personnel at Brookdale Hospital recognized Samuel was having a stroke until, at the earliest, many hours after he was brought in. ECF 146 ¶¶ 137, 145. That trained medical professionals did not immediately recognize signs of stroke seriously undermines the argument that police officers at the chaotic scene of this incident were unreasonable for making the same oversight.

Plaintiff points to statements in medical expert Dr. Siddhartha Nadkarni's deposition and report to raise a factual dispute over whether Samuel's acute medical distress "should have been obvious to police officers at the scene." *See* ECF No. 148 ¶ 221; ECF No. 144-2 at 5. However, even at the summary judgment stage, courts are not required to credit testimony that is "so clearly contradicted by other evidence that no reasonable jury would believe it." *See Fendi Adele, S.R.L. v. Ashley*

*Reed Trading, Inc.*, 507 F. App'x 26, 31 (2d Cir. 2013) (explaining the holding of *Scott v. Harris*, 550 U.S. 372, 378–80 (2007)).

Moreover, whether it was obvious to the arresting officers that Samuel had experienced a stroke is not a topic Dr. Nadkarni can testify to as an expert. *See* Fed. R. Evid. 702; *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (expert testimony regarding the state of mind of others was inadmissible because it had no basis in expertise and because it described matters which a jury was capable of understanding without expert help). If anything, by virtue of his extensive medical expertise,[2] Dr. Nadkarni is particularly *unqualified* to opine on whether symptoms of stroke would have been obvious to arresting officers. This is illustrated by the fact that the section of Dr. Nadkarni's deposition discussing this issue uses the terms "receptive aphasia," "massive dominant hemisphere stroke," and "hemiparesis" to describe Samuel's symptoms. *See* ECF No. 144-2, at 60:7–65:8. Such terms would not be understood by a layperson, reflecting that Dr. Nadkarni is not well positioned to assess whether officers should have realized that Samuel had experienced a stroke when he was arrested. To the extent Dr. Nadkarni's opinion on the obviousness of Samuel's symptoms is offered as layperson testimony, it is inadmissible because it is not based on any first-hand perception of Samuel's

[2] The declaration attached to Dr. Nadkarni's report reflects that he is board certified in "neurology and psychiatry, as well as clinical neurophysiology, epilepsy, and neuropsychiatry and behavioral neurology." ECF No. 144-22.

state at the time of his arrest. *See* Fed. R. Evid. 701; *United States v. Kaplan*, 490 F.3d 110, 119 (2d Cir. 2007).

In sum, because there was probable cause for Samuel's arrest, defendants' motion for summary judgment is granted as to all false arrest claims asserted in plaintiff's third amended complaint.

**3. Excessive Force**

Plaintiff next asserts a Section 1983 claim for excessive force in violation of the Fourth Amendment.

**a. Legal Standard**

To state a Section 1983 claim premised on excessive force, a plaintiff must establish that (1) a seizure occurred, (2) the force exerted upon them was unreasonable "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham v. Connor*, 490 U.S. 386, 396 (1989), and (3) the defendant officers against whom plaintiff seeks judgment were personally involved, *John v. City of New York*, 406 F. Supp. 3d 240, 245 (E.D.N.Y. 2017). This test is purely objective—the underlying intent of the officers against whom the excessive force claim is asserted is irrelevant. *See Graham*, 490 U.S. at 397; *Wang v. Vahldieck*, No. 09-CV-3783 (ARR) (VVP), 2012 WL 119591, at *6 (E.D.N.Y. Jan. 9, 2012).

In assessing whether the amount of force exerted on a plaintiff was reasonable, courts should look to the circumstances of the individual case "including the severity

of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. These factors must then be weighed against the degree of force used. *Id*. Some allowance "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving" must be made. *Id.* at 396–97. Moreover, qualified immunity will shield officers from liability where they have a mistaken but reasonable belief that their use of force was objectively reasonable. *See Saucier v. Katz*, 533 U.S. 194, 206 (2001).

When multiple officers are involved, plaintiffs are not necessarily required—at the summary judgment stage—to identify which were direct participants and which failed to intervene. Rather, a reasonable jury may find excessive force, or failure to intervene to prevent it, where there is evidence that an officer participated in an incident during which excessive force was exerted. *See, e.g.*, *John*, 406 F. Supp. 3d at 245; *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003), *aff'd sub nom.*, *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) (explaining that, on summary judgment, that "[a] plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene"); *Ricks v. O'Hanlon*, No. 07 Civ. 9849 (WHP), 2010 WL 245550, at *4 (S.D.N.Y. Jan. 19, 2010).

**b. Analysis**

No party disputes that a seizure occurred. *See* ECF No. 142-1 at 4–5; ECF No. 146 ¶¶ 57–58. The key question is whether genuine issues of material fact remain as to (1) the reasonableness of the force exerted upon Samuel and (2) the personal involvement of each defendant officer.

The undisputed facts do not justify dismissing plaintiff's claims for excessive force against Molinski, Calderon, and Gonzalez. It is undisputed that Molinski punched Samuel in the face twice shortly after removing him from the van. ECF No. 146 ¶ 61. Whether this use of force was reasonable under the circumstances and whether the defendant officers are entitled to qualified immunity are both fact-intensive questions not resolved by the undisputed facts. Issues of fact remain as to whether Samuel was repeatedly stepping on the gas pedal and whether he made, or was capable of making, movements consistent with an intent to evade arrest. ECF No. 146 ¶¶ 48–49, 59–60.

Likewise, there are outstanding questions of material fact regarding whether Calderon and Gonzalez—who were concededly on the scene when Samuel was struck—had the opportunity to intervene. When an excessive force claim is permitted to proceed to trial, courts in this Circuit "are reluctant to grant summary judgment on a dependent failure to intervene claim unless the evidence is clear that the alleged excessive force was not of a sufficient duration to permit a bystander officer to intervene." *Ali v. Ramos*, No. 1:16-cv-01994 (ALC), 2020 WL 5817009,

at *6 (S.D.N.Y. Sept. 30, 2020). In this case, deposition testimony suggests that Calderon and Gonzalez were in proximity to Molinski when Samuel was hit in the face. *See* ECF 144-5, at 134, 155–56. There is also evidence in the record suggesting that thirty to forty seconds elapsed between when Samuel was removed from the car and when he was taken to the ground by officers, during which he was punched in the face. ECF No. 146 ¶¶ 61–64. A reasonable jury could therefore find that Calderon and Gonzalez had a realistic opportunity to prevent the use of excessive force against Samuel but failed to do so.

In addition to Molinski's two punches, there is a genuine dispute of material fact regarding whether other forms of excessive force were used on Samuel resulting in injuries to his arms and legs. *See* ECF No. 148 ¶ 278. Since Molinski, Calderon, and Gonzalez were involved in the arrest during which these injuries occurred, plaintiff's excessive force claim also survives summary judgment based on these injuries. *See John*, 406 F. Supp. 3d at 245 (a plaintiff with an excessive force claim "need only produce evidence that the Officer Defendants were present on the night in question and participated in his arrest" to survive summary judgment); *Jeffreys*, 275 F. Supp. 2d at 475 (inability to identify "which officers did what to [the plaintiff]" was not dispositive on summary judgment where there was undisputed evidence that defendant officers were in the vicinity of the alleged assault). Plaintiff is therefore entitled to try its excessive force claims against Molinski, Calderon, and Gonzalez for direct liability and—in the alternative—for failure to intervene. *See*

*Buchy*, 2015 WL 8207492, at *3 (explaining that although a defendant cannot be simultaneously liable for excessive force and failure to intervene to prevent that use of force, both claims can proceed past summary judgment as alternative theories of liability).

Conversely, plaintiff has not raised sufficient questions of material fact to justify a trial on its excessive force claims against Merrick or Roberts. It is undisputed that neither Merrick nor Roberts was at the scene of the incident at the time Samuel sustained his injuries. ECF No. 146 ¶¶ 86, 122. As such, no reasonable jury could find that these defendants either directly used excessive force against Samuel or were in a reasonable position to intervene and prevent it. Defendants' motion for summary judgment is granted as to the excessive force claims against Lieutenant Merrick and Officer Roberts.

**4. Denial of Medical Care**

Plaintiff lastly asserts a Section 1983 claim for denial of medical care. *See* ECF No. 99 ¶¶ 45–52. Plaintiff's claim is premised on the theory that the defendant officers are liable for incorrectly telling Brookdale Hospital staff that Samuel was intoxicated, resulting in delayed care for stroke. *See* ECF No. 144, at 23–24. In plaintiff's view, hospital staff accepted officers' erroneous statements that Samuel was intoxicated as true, leading them to ignore symptoms of stroke. *Id.* at 24. As a result, hospital staff missed the time window within which Samuel could have

received "clot buster" medication, which could have alleviated the symptoms of stroke. *Id.*

**a. Legal Standard**

A pre-arraignment detainee's Section 1983 claim based on the alleged denial of adequate medical care is "governed by the Due Process Clause of the Fourteenth Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29–30 (2d Cir. 2017); *see also Darby v. Greenman*, 14 F.4th 124, 128 (2d Cir. 2021) (tracing development of this doctrine). To establish a substantive due process violation, a plaintiff must demonstrate that the challenged government action "offend[s] those canons of decency and fairness which express the notions of justice of English-speaking peoples." *Rochin v. California*, 342 U.S. 165, 169 (1952) (quoting *Malinski v. New York*, 324 U.S. 401, 417 (1945)); *see also Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005) (Government action which is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" violates the Due Process Clause. (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998))). In the denial of medical care context, this standard is met when government actors are deliberately indifferent to the medical needs of detainees. *Lewis*, 523 U.S. at 850; *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019). To prevail on such a claim, plaintiffs must show both that they had a "serious medical need" and that the defendant "acted with deliberate indifference" regarding that need. *Charles*, 925 F.3d at 86.

Satisfying the "serious medical need" prong requires proof that the plaintiff was actually deprived of adequate medical care and that the inadequacy in medical care was sufficiently serious. *See Singletary v. Russo*, 377 F. Supp. 3d 175, 188 (E.D.N.Y. 2019). Factors relevant to seriousness include: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702–03 (2d Cir. 1998) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992)). Generally, "the actual medical consequences that flow from the denial of care are highly relevant in determining whether the denial of treatment subjected the detainee to a significant risk of serious harm." *Charles*, 925 F.3d at 86.

To satisfy the "deliberate indifference" prong, a plaintiff must prove that the "defendants *knew* [or should have known] that failing to provide . . . medical treatment would pose a substantial risk to [the detainee's] health." *Id.* at 87. The issue of substantial risk is a question of fact "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* This includes proving that the defendant must have known of the risk because the risk was obvious. *Id.*

Generally, police officers are not deliberately indifferent to medical needs when they promptly summon medical help or take the injured detainee to the hospital. *See Campbell v. City of Yonkers*, No. 19 CV 2117 (VB), 2023 WL

4867459, at *14 (S.D.N.Y. July 31, 2023) ("The record establishes [that the defendant-officer] called for an ambulance within a minute after the shooting [leading to the detainee's injury] occurred, and then radioed again to request a rush on the ambulance. The Constitution requires no more.") (internal citations omitted); *Rasmussen v. City of New York*, 766 F. Supp. 2d 399, 414 (E.D.N.Y. 2011) ("The obligation of the police to provide necessary medical treatment upon request by a detainee or based upon the obvious need for treatment is satisfied when the police summon medical assistance; they have no duty to provide that assistance themselves . . . ."). In contrast, deliberate indifference may still be found where an officer causes a plaintiff to wait for prolonged periods before receiving medical treatment. *See Bright v. Annucci*, No. 18-cv-11111 (NSR), 2024 WL 3012043, at *8 (S.D.N.Y. June 13, 2024).

**b. Analysis**

Defendants argue that Samuel's observable injuries were insufficiently serious to support a claim for denial of medical care. ECF No. 142-1, at 21. However, the core disagreement between the parties is whether any of the defendant officers exhibited deliberate indifference to Samuel's medical needs. There is ample evidence in the record from which a jury could find that Samuel's injuries were sufficiently serious. He was unresponsive, had been struck in the face, and was bleeding from his nose and mouth. ECF No. 146 ¶¶ 62, 79, 235, 229. Nevertheless, it is undisputed that multiple ambulances were requested for Samuel, who was

promptly brought to the hospital by non-party officers Mitial and Collings. ECF No. 146 ¶¶ 77–78, 94, 109, 135–36. Plaintiff argues that defendants were deliberately indifferent to Samuel's medical needs because—at various points—they incorrectly relayed that he was intoxicated, contributing to his delayed treatment for stroke. *See* ECF No. 144, at 23–24.

Because there is insufficient evidence that any defendant knew or should have known that stating Samuel was intoxicated would delay his treatment for stroke, no reasonable jury could find that any defendant was deliberately indifferent to Samuel's medical needs.

Taking each defendant in turn: For Molinski's part, it was unforeseeable that claiming Samuel had alcohol on his breath would result in delayed treatment for stroke. *See Ramlogan v. White*, No. 20 Civ. 5879 (JPC), 2024 WL 1313417, at *6 (S.D.N.Y. Mar. 27, 2024) (describing foreseeability as "the touchstone" of the deliberate indifference analysis in Section 1983 claims). Setting aside the issue of whether Molinski realized Samuel was having a stroke, nothing in the record suggests Molinski claimed Samuel smelled of alcohol with the knowledge that this claim would—multiple retellings down the line—result in delayed care for stroke. Nor could a jury find that Molinski *should have known* that his statements regarding Samuel would lead to such delayed care, since it was not an "obvious consequence of his action." *See Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("Deliberate indifference is a stringent standard of fault, requiring proof that a

municipal actor disregarded a known or obvious consequence of his action." (internal quotation marks omitted) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997))).

For the same reasons, a jury could not find that Calderon or Gonzalez repeated the incorrect information that Samuel was intoxicated with actual or constructive knowledge that this would delay his care for stroke. Indeed, plaintiff does not identify evidence in the record that could support a finding that Calderon or Gonzalez ever stated Samuel was intoxicated in the first place.

Similarly, while a jury could find that Merrick or Roberts were sources of the incorrect information—provided to hospital staff—that Samuel was intoxicated, there is no evidence to support a finding that either knew this information was incorrect or would delay care. Lieutenant Merrick told non-party officers Mitial and Collings to drive Samuel to the hospital. ECF No. 146 ¶¶ 92, 94. As plaintiff's counterstatement of material facts correctly points out, a jury could therefore "reasonably conclude that [the information that Samuel was intoxicated] was provided to Mitial and Collings by defendant Merrick." *Id.* ¶ 265. However, no evidence supports the conclusion that Merrick had actual or constructive knowledge that Samuel was not intoxicated or that he had suffered a stroke. It is undisputed that Samuel was already handcuffed when Merrick arrived on the scene, and no evidence suggests Merrick ever spoke to or tried to interact with Samuel. *See id.* ¶¶ 80, 86. Plaintiff's assertion that Lieutenant Merrick "must have known" that Samuel

was not intoxicated is not supported by any evidence in the record, which is perhaps why plaintiff's brief cites no support for this conclusory statement. *See* ECF No. 144, at 24. Without evidence suggesting Merrick knew or should have known that Samuel was not in fact intoxicated, a reasonable jury could not find that Merrick was deliberately indifferent.

Officer Roberts spoke to officers at the scene before going to the hospital sometime "after midnight," ECF 146 ¶¶ 257–58, which roughly coincides with when a hospital physician noted that Samuel was brought in with ethanol intoxication, *see id.* ¶¶ 255–56. From this, a jury could find that Roberts was the source of the claim Samuel was intoxicated. However, because it is undisputed that Roberts did not know Samuel suffered a stroke at the time of the incident, *id.* ¶ 132, a jury could not find that he told hospital staff Samuel was intoxicated with either actual or constructive knowledge that it would delay care for stroke.

More broadly, plaintiff has identified no cases suggesting that an officer could be held liable for denial of medical care when erroneous information was relayed to medical providers, even if every effort was made to get a detainee to the hospital. To be sure, courts recognize liability for denial of medical care where officers either fail to deliver a plaintiff to the hospital or unreasonably delay in bringing a plaintiff to the hospital. *See, e.g.*, *Bradway v. Town of Southampton*, 826 F. Supp. 2d 458, 469–70 (E.D.N.Y. 2011) (summary judgment denied as to medical indifference claim where officers observed the arrestee ingest a large amount of cocaine and

delayed in bringing him to the hospital). These cases do not avail plaintiff because it is undisputed that multiple ambulances were promptly called and Samuel was brought to the hospital approximately thirty-one minutes after his collision. ECF No. 146 ¶¶ 77–78, 135. Plaintiff does not cite a single case in which officers were found liable under Section 1983 for denial of medical care based on inadvertently providing incorrect information to the staff that treated the plaintiff. At the very least, the lack of cases holding that an officer violates a detainee's constitutional rights by providing incorrect information to medical staff means it was not a "clearly established" right and defendants would be entitled to qualified immunity. *See Campbell v. City of Yonkers*, No. 19 CV 2117 (VB), 2023 WL 4867459, at *14 (S.D.N.Y. July 31, 2023).

Moreover, a reasonable jury could not find that any of the defendants failed to intervene to prevent the denial of medical care to Samuel. As explained above, by promptly bringing Samuel to the hospital, officers satisfied the full extent of their duty to provide medical care under established law. Based on the undisputed facts, the only defendant present at the hospital—Roberts—had no reason to know that the information being relayed to hospital staff would delay stroke care because he did not know Samuel had suffered a stroke. ECF No. 146 ¶ 132.

In sum, defendants' summary judgment motion is granted as to all denial of medical care claims in plaintiff's third amended complaint.

**5. Punitive Damages**

Lastly, defendants seek to preclude plaintiff from obtaining punitive damages for any of its claims. ECF No. 142-1, at 27–28. Since only the excessive force claims against Molinski, Calderon, and Gonzalez survive summary judgment, the issue turns on the availability of punitive damages for those claims.

A Section 1983 plaintiff may recover punitive damages against officials sued in their personal capacity if the officials acted with malicious or evil intent or in callous disregard of the plaintiff's federally protected rights. *Smith v. Wade*, 461 U.S. 30, 51 (1983). Where a plaintiff's Section 1983 claim premised on excessive force survives summary judgment, the question of punitive damages is usually left to the jury. *See, e.g.*, *Emblen v. Port Auth. of New York/New Jersey*, No. 00 Civ. 8877 (AGS), 2002 WL 498634, at *12 (S.D.N.Y. Mar. 29, 2002); *Farnsworth v. City of Geneva*, 750 F. Supp. 3d 152, 170 (W.D.N.Y. 2024). Viewing the record in the light most favorable to the plaintiff, a reasonable jury could find that Molinski, Calderon, and Gonzalez are liable for punitive damages. Though the "scene . . . was chaotic," ECF 142-1, at 27, a jury could nevertheless find that Molinski's strikes to Samuel's face were purely malicious rather than arguably necessary. Likewise, depending on a jury's understanding of how Samuel sustained the injuries to his arms and legs, a jury may find that any of the three remaining defendants acted with evil intent or callous disregard. Thus, plaintiff is permitted to seek punitive damages

from the jury on the claims surviving summary judgment—the excessive force claims against officers Molinski, Calderon, and Gonzalez.

**CONCLUSION**

Defendants' motion for summary judgment is GRANTED as to the false arrest claims and denial of medical care claims against all defendants, as well as the excessive force claims against Vance Merrick and Dean Roberts. Defendants' motion for summary judgment is DENIED as to the excessive force claims against Daniel Molinski, Jonathan Calderon, and Ashley Gonzalez. Additionally, plaintiff is entitled to present the issue of punitive damages on the surviving excessive force claims to a jury.

**SO ORDERED.**

Brooklyn, New York
August 11, 2026

/s/ Edward R. Korman
Edward R. Korman
United States District Judge